UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DOLCO INVESTMENTS, LTD., CYPRESS,

                  Plaintiff,

   - against -

MOONRIVER DEVELOPMENT, LTD.,
GML, LTD., and KEVIN BROMLEY,

               Defendants.

------------------------------------X

06 Civ. 12876 (RWS)

O P I N I O N



A P P E A R A N C E S:

      Attorneys for Plaintiff

      LYONS & FLOOD, LLP
      65 WEST 36TH STREET, 7TH FLOOR
      NEW YORK, NY 10018
      BY: KIRK M. LYONS

      Attorneys for Defendant

      GREENBERG TRAURIG, LLP
      800 CONNECTICUT AVENUE, NW SUITE 500
      WASHINGTON, D.C. 20006
      BY: SANFORD M. SAUNDERS, JR.

**Sweet, D.J.**

      Defendants Moonriver Development, Ltd. ("Moonriver"),
GML, Ltd. ("GML") and Kevin Bromley ( "Bromley") (collectively,
"Defendants"), have moved under Rules B and E(4)(f) of the

1

Supplemental Rules for Certain Admiralty and Maritime Claims of the Fed.R.Civ.P. to vacate the Court's Ex-Parte Order for Process of Maritime Attachment and Garnishment dated November 2, 2006 (the "Order") obtained by Plaintiff Dolco Investments, Ltd., Cyprus ("Dolco") and to dismiss the Verified Complaint (the "Complaint") of Dolco against them under Fed.R.Civ.P. 12(b), or alternatively to require that Plaintiff Dolco post security for the funds subject to attachment.

Dolco has moved to amend its complaint, substituting the proposed verified amended complaint (the "Amended Complaint") pursuant to F.R.Civ.P. 15(a). For the reasons set forth below, the motion to vacate the attachment is granted, the motion to dismiss is granted as to GML, and the motion to file an amended complaint is granted.

## Prior Proceedings

On November 2, 2006, Dolco filed its admiralty complaint seeking damages of $3,490,399.65 and an attachment. The complaint and the ex parte request for an attachment were submitted and an order of attachment was entered on November 2, 2006 (the "Order").

The Defendants' motion to vacate the attachment was marked fully submitted on January 3, 2007. In its opposition to the motion Dolco withdrew its claims against Bromley (Plaintiff's

1

Memorandum in Opposition at 1).

## The Facts

Moonriver is a company formed under the laws of the British Virgin Islands and the owner of the M/V Constellation (the "Vessel"). The Vessel is a passenger ship of approximately 290 feet and 24 cabins. It is worth approximately $50,000,000. Moonriver is a wholly owned subsidiary of GML which is a company registered in Gibraltar. GML is a diversified financial holding company, established in 1997, and it owns strategic interests in a number of companies, as well as a number of financial portfolio investments in stock markets internationally.

On November 14, 2005, Moonriver executed the Operational Items Agreement ("Agreement") with Dolco under which Dolco agreed to supply operational items to Moonriver. On September 8, 2006, by letter to Dolco, Moonriver terminated the Agreement for cause pursuant to section 7 of the Agreement. The Agreement provides that defendant Moonriver is the owner of the Vessel and that plaintiff had agreed to supply to the owner the Operational Items defined therein as:

> 'OPERATIONAL ITEMS' means the supply of crew for the Vessel, organising the insurance of the Vessel in all forms, repair and maintenance of the Vessel and other general expenses incurred in operating the vessel

3

> including, but not limited to,
> telecommunications services, staff uniforms,
> medical supplies, port disbursements and costs
> and warehousing of fuel and provisions.

Saunders Aff., Ex. 1.

Under an oral contract (the "Oral Agreement") for an additional payment every month, Dolco would provide further services such as technical support, administration, supervision, preparation, assistance and support of the vessel and to rectify the fluctuation of the US dollar exchange rate.

On September 14, 2006, Dolco filed a petition for, and obtained, an arrest order of the Vessel in the Commercial Tribunal for Menton, France in order to secure its claims against Moonriver for breach of the Agreement. Due to the bad weather conditions, the Vessel was compelled to shift along the coast out of the Menton jurisdiction. On September 16, 2006, Dolco filed a similar petition in the Commercial Court of Marseille, France, based on an alleged claim of $8,172,562.24 in damages. On September 18, 2006, the Commercial Court in Marseille issued a second arrest order and Dolco arrested the Vessel.

On October 6, 2006, the French Court issued another order whereby it reduced the requested amount of security. The court held that the Dolco's claims consisted both of maritime claims and

4

ancillary non-maritime claims.  In reducing the attachment to the amount of the maritime claim, the court distinguished between those amounts related to expenses already incurred by Dolco for account of Moonriver in connection with the use of the Vessel, determined to be maritime claims as defined in Article 1-d of the International Convention for the Unification of Certain Rules Relating to Arrest of Sea-going Ships (Brussels, May 10, 1952), and those remaining amounts which represented expenditures unrelated to the operations of the vessel, determined not to qualify as maritime claims.  In particular, in support of its petition for the arrest of the Vessel, Dolco claimed the outstanding balance for budget installments and commission fees due for August - October 2006 in the amount of \$772,562.24 plus pre-judgment interest, and economic damages as a result of the repudiatory breach of the agreements by Moonriver in the amount of \$7,400,000.

By letter of April 2, 2007, the Defendants have advised that the Vessel is no longer restrained pursuant to the arrest order issued by the Commercial Court of Marseille an appropriate bond having been posted.

Pursuant to the Agreement, the dispute between the parties is currently before the Bench Division Commercial Court in London.

In the courts of all three jurisdictions in which it has

5

filed claims, Dolco has alleged losses and damages suffered as a result of Moonriver's alleged breach of the Agreement. The amount of Dolco's alleged damages has varied from $8,172,562.24 in the French Courts to $3,314,229.20 in English Court and $3,490,399.65 in this Court.

As indicated in the November 22 and December 8 Notices of Attachment, two electronic fund transfer ( "EFT") payments were attached at Citibank in the total amount of $625,861.02 at its Funds Transfer Network ("FTN") unit in Buffalo, New York. The service of the attachment Order on Citibank was made in the Eastern District of New York.

Citibank has advised Dolco that the FTN Unit was an office of Citibank, its employees were employed directly by Citibank, and the FTN Unit's role was limited to operating an "OFAC filter" which for technical reasons could not be located at Citibank's headquarters located at 399 Park Avenue in New York, New York. The EFTs captured by the FTN Unit are ultimately controlled and managed by Citibank New York. (Lyons Aff., Ex. B).

The EFTs restrained by Citibank indicate that GML was the originating party and HSBC London was the originating bank. Citibank is the recipient bank for the payees, Covington & Burling and APCO.

6

**The Burden of Proof**

"[M]aritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844." Aurora Mar. Co. v. Abdullah Mohamed Fahem & Co., 85 F.3d 44, 47 (2d Cir. 1996). To begin the process by which party may attach another party's assets, a plaintiff must file a verified complaint seeking attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. Fed.R.Civ.P.Supp. Rule B(1). Thereafter, Rule E(4)(f) provides that any person claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Id. at E(4)(f). Therefore, the plaintiff has the burden to show that the attachment should not be vacated, and at the hearing the defendant can attack "the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed.R.Civ.P.Supp. Rule E(f), advisory committee's note.

Under Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd., 460 F.3d 434 (2d Cir. 2006), in a Rule E(4)(f) inquiry

challenging a Rule B attachment, a plaintiff has the burden to show only that: (a) it has a prima facie admiralty claim; (b) the named defendants cannot be found within district; (c) the attached defendant's property was within the district; and (d) that there is no statutory or maritime law bar to the attachment.  Aqua Stoli, 460 F.3d at 445.

It is conceded that Moonriver and GML cannot be found in this district.  What is at issue is the nature and extent of Dolco's claim, the adequacy of the security obtained by Dolco, the adequacy of the complaint against GML, and the location and ownership of the property attached.

## Dolco Has Established an Admiralty Claim

To sustain the attachments, Dolco must demonstrate that it has "an in personam claim against Defendants which is cognizable in admiralty ....  In other words, the plaintiff's claims must be one which will support a finding of admiralty jurisdiction.  " Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002) (quoting Robert M. Jarvis,   An Introduction to Maritime Attachment Practice Under Rule B, 20 Journal of Maritime Law and Commerce, No 4 (October 1989) at 526 & n. 20); see also Maritima Petroleo e Engenharia Ltda. v. Ocean Rig 1 AS and Ocean Rig 2 AS, 78 F. Supp.2d 162, 166 (S.D.N.Y. 1999) (lack of maritime jurisdiction renders Rule B attachment void).

8

"The boundaries of admiralty jurisdiction over contracts
. . . being conceptual rather than spatial, have always been
difficult to draw. Precedent and usage are helpful insofar as they
exclude or include certain common types of contract . . . ."
Kossick v. United Fruit Co. ___, 365 U.S. 731, 735 (1961).
Historically, a maritime contract is one that "relates to a ship in
its use as such, or to commerce or to navigation on navigable
waters, or to transportation by sea or to maritime employment."
Stolt-Nielsen Transp. Group, Inc. v. Celanese AG, 430 F.3d 567, 572
(2d Cir. 2005) (quoting CTI-Container Leasing Corp. v. Oceanic
Operations Corp., 682 F.2d 377, 379 (2d Cir. 1982)). In
determining whether a contract falls within the admiralty
jurisdiction, the "true criterion is the nature and subject matter
of the contract, having reference to maritime service or maritime
transactions." Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S.
603, 610 (1991) (quoting Insurance Co. v. Dunham, 78 U.S. 1 at 26
(1871)). The "fundamental interest giving rise to maritime
jurisdiction is the protection of maritime commerce." Id. at 608
(quoting Sisson v. Ruby, 497 U.S. 358, 367 (1990)).

The majority of courts in this district to have
considered the issue have interpreted Aqua Stoli to require the
application of the prima facie standard when considering the
adequacy of the claim in a maritime vacatur motion.     See SPL
Shipping, Ltd. v. Gujarat Cheminex, Ltd., 2007 U.S. Dist. LEXIS

9

18562, at *8 (S.D.N.Y. Mar. 15. 2007); Fesco Ocean Mgmt., Ltd. v. High Seas Shipping, Ltd., 2007 U.S. Dist. LEXIS 19970, at *9 (S.D.N.Y. Mar. 12, 2007) (dicta); Secil Martima U.E.E. v. Malev Shipping, et al., No. 06 Civ. 6345 (S.D.N.Y. Oct. 10, 2006) (transcript of Rule E(4)(f) hearing denying vacatur motion); Route Holding Inc. v. Int'l Oil Overseas, Inc., No. 06 Civ. 3428 (S.D.N.Y. Sept. 29, 2006) (order denying vacatur of maritime attachment); Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979 (S.D.N.Y. Aug. 15, 2006) (order vacating attachment); but see Wajilam Exps. (Singapore) Pte. Ltd.v. ATL Shipping Ltd., 2006 U.S. Dist. LEXIS 77033 (S.D.N.Y. Oct. 23, 2006) (holding that the applicable standard for establishing the Aqua Stoli factors is "reasonable grounds" for an attachment). The Court agrees with the weight of authority in this district, and will apply the prima facie standard, as it more closely comports with the Second Circuit's rejection of the "broader Rule E(4)(f) inquiry" that the reasonable grounds test would necessarily include. Aqua Stoli, 460 F.3d at 436; see also SPL Shipping, 2007 U.S. Dist. LEXIS 18562 at *8-*10; Tide Line, No. 06 Civ. 1979, Aug. 15, 2006 Order at 17.

Dolco's claims arise out of the Agreement and alleged Oral Agreement between it and Moonriver, the owner of the Vessel. Under the Agreement, Dolco agreed to supply to the Owner the operational items for the Vessel. In exchange, Moonriver agreed to a budget of $3,400,000 per year which was to be paid to Dolco in four equal quarterly installments. Under the alleged Oral

10

Agreement, Moonriver allegedly agreed to pay a $25,000 monthly fee to Dolco in addition to the twenty-five percent profit it claims it was entitled to earn from the budget amount under the Agreement. In its First Cause of Action, Dolco alleges that monthly fees plus six percent pre-judgment interest for June-October 2006 time period are due and owing. The Commercial Court in Marseille concluded that $775,000 constituted a maritime claim, and it is assumed that the invoices rendered as described in the first cause of action covered goods and services provided for the Vessel.

In addition, Dolco has claimed in its Second and Third Causes of Action that Moonriver's termination of the Agreement/Oral Agreement constituted a breach of the agreements causing lost profits in the amount of $2,532,500.30 or, alternatively, $98,333.33. Finally, Dolco seeks full indemnification against third-party suppliers to the Vessel to whom Dolco has incurred liabilities in its Fourth Cause of Action.

Traditionally, the supplying of goods to a vessel in aid of a voyage are deemed to establish the basis for claims and remedies cognizable in admiralty. Garcia v. Warner, Quinlan Co., 9 F. Supp. 1010, 1011 (S.D.N.Y. 1934). Although Dolco does not directly allege any services or supplies were furnished during the period for which it claims payment of budget installments and commissions, the findings of the French court and the period covered by the First Cause of Action constitute an adequate

11

allegation that actual services were provided or products supplied by Dolco to the Vessel. Furthermore, such an action is clearly within the admiralty jurisdiction of the Court, as Defendants effectively concede in their reply brief (Def. Reply at 3). See Archawski v. Hanioti, 350 U.S. 532, 535 (1956); Compania Argentina De Navegacion Dodero v. Atlas Mar. Corp. , 144 F. Supp. 13, 14 (S.D.N.Y. 1956).

However, Dolco's claims for economic damages (its Second and Third Causes of Action) resulting from alleged repudiatory breach of the Agreement or the Oral Agreement by Moonriver do not create an admiralty jurisdiction. Despite the fact that the Agreement and Oral Agreement pertain to just one vessel, the four year commitment to supply all operational items for the Vessel is analogous to requirements contracts that courts have found to be outside of admiralty jurisdiction, rather than the one-transaction supply or repair contracts that fall within admiralty jurisdiction. See Compania Argentina, 144 F. Supp. at 14 (distinguishing executory contracts for repair of a specific ship at a specific time as within admiralty from general requirements contracts as outside of admiralty); Steamship Overdale Co. v. Turner, 206 F. 339, 341 (E.D. Pa. 1913) (contract to supply fuel to fleet of ships not within admiralty jurisdiction); Garcia, 9 F. Supp. at 1011 (same); cf. The Yankee, 37 F. Supp. 512, 514 (E.D.N.Y. 1941) (holding that entire repudiation of repair contract by the defendant is not within admiralty jurisdiction).

12

Under its fourth cause of action, Dolco seeks full indemnity from Defendants against liabilities it has incurred to third-party suppliers to the Vessel. However, the only costs which were identified by Dolco and included in the calculation of the maritime attachment are legal fees in the amount of $150,000 that Dolco has incurred and/or anticipates to incur in connection with the litigation it instituted against Moonriver in England.  Here Dolco has failed to establish what, if any, particular services or supplies were provided to the Vessel and whether such services or supplies were related to the operations of the Vessel.

To the extent Dolco has pled a breach for supplies and services provided for the benefit of the Vessel, its maritime claim does not exceed the amount of $775,000 -- or does so by a de minimus amount.  (See Dec. 29, 2006 Letter by Dolco's French counsel attached to Lyons Aff., Ex. C; Compl. at 17).  As to the remaining claims, Dolco has not established that Defendants are withholding from it any amount that would currently be due and owing under the Agreement and the Oral Agreement.  These claims remain outside the admiralty jurisdiction for reasons stated above.

## Dolco Has Established Adequate Security

In <u>Aqua Stoli</u>, the Court of Appeals confirmed the district court's equitable discretion to vacate maritime

13

attachments when the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. 460 F.3d at 445; <u>see</u> <u>also</u> <u>Allied Mar., Inc. v. Rice Corp.</u>, 2004 U.S. Dist. LEXIS 20353 at *9 (S.D.N.Y. Oct. 12, 2004) (attachment may be vacated if a plaintiff cannot show he needs the security of the attachment to satisfy any judgment it may win in the underlying suit).

Moonriver has apparently exercised its option to lift the arrest of the Vessel by posting a guarantee for the amount of the maritime claim allowed by the French Court, and the resultant security of $775,000 is sufficient to protect the maritime portion of Dolco's claims asserted in this Court. (See Apr. 2, 2007 Letter of Saunders to the Court).

## The Attachment Did Not Reach Property of GML

The Defendants have contended that the property represented by the EFT was not attached within this district but rather in the Western District because of the location of Citibank's Funds Transfer Network ("FTN") unit there.

However, EFTs are intangible property under Rule B, and are described by the <u>Aqua Stoli</u> court as "funds . . . in an intermediary bank temporarily as a credit before being passed through to the beneficiary of the transaction or another

14

intermediary bank." Aqua Stoli, 460 F.3d at 436 n.1. The process

of how EFTs work is more fully described in Noble Shipping, Inc. v.

Euro-Maritime Chartering, Ltd., 2003 U.S. Dist. LEXIS 23008 at *8

(S.D.N.Y. Dec. 24, 2003):

> Simply stated, the mechanics of an electronic transfer
> between two foreign parties transacting business in U.S.
> dollars are the following. A customer "the originator")
> commences an EFT by instructing its bank ("the
> originating bank") to transfer funds to a beneficiary.
> Because the beneficiary is not located in the United
> States, it only maintains an account with a foreign bank
> ("the beneficiary's bank"). The beneficiary's bank,
> because it does not operate in the United States,
> maintains a U.S. dollar account with an American bank
> ("the intermediary bank"). The originating bank sends
> the originator's payment instructions to the intermediary
> bank, including the name and account number of the
> intended beneficiary. The intermediary bank executes
> those instructions by crediting funds into the
> beneficiary bank's U.S. dollar account at the
> intermediary bank. Subsequently, the beneficiary's bank
> pays the beneficiary by crediting the appropriate sum in
> the beneficiary's account at the beneficiary's bank.[1]

         The Honorable Lewis Kaplan has stated it accurately in

the view of this Court:

> In this wired age, the location of an intangible,
> especially a bank account, is a metaphysical question.
> By and large, bank deposits exist as electronic impulses
> embedded in silicon chips. In a sense, therefore, bank
> funds are both everywhere and nowhere.

---

[1] The understanding of the Court is that the beneficiary bank
due to receive the EFTs in this case operates in the United
States, but takes Judge Cote's description to largely conform to
the process involved in the instant case.

Yayasan Sabah Dua Shipping SDN BHB v. Scandinavian Liquid Carriers, Ltd., 335 F. Supp. 2d 441, 448 (S.D.N.Y. 2004). Judge Kaplan concluded that resolution of the dispute called "for application of a pragmatic rule of reason" and held that since for "all practical respects the Cayman Islands branch was part of the New York branch" the funds attached should be considered to be in New York. Id. at 449. Here, since Citibank New York has ultimate control over what EFTs are restrained and what EFTs are released, the same "pragmatic rule of reason" will be applied here equally as well. (See Dec. 28, 2006 Email from Mary Mihalik to Jon Mars attached to Lyons Aff., Ex. B). Thus, the Court finds that the attached assets are within the Southern District of New York.

Nonetheless, Plaintiff has failed on this record to establish that the EFT was the property of GML when received by Citibank. EFTs captured at an intermediary bank while in transit from the originator to the beneficiary are attachable assets. See Aqua Stoli, 460 F.3d at 443-44. In  Winter Storm, the Second Circuit held that such EFTs may be attached as property of either the originator or beneficiary. See 310 F.3d at 278. This decision was subsequently questioned in by the Second Circuit in a footnote. See Aqua Stoli, 460 F.3d at 446 n.6. Relying on this footnote, the Honorable Jed Rakoff ruled that EFTs are not attachable as assets of the beneficiary until they have passed to the beneficiary's bank. See Seamar Shipping Corp. v. Kremikovtzi Trade, Ltd., 461 F. Supp. 2d 222, 226 (S.D.N.Y. 2006). Every other court in this

16

district to have considered the issue, however, has held that EFTs captured at the intermediary bank are attachable as assets of the beneficiary. See Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co., 2007 U.S. Dist. LEXIS 24737 at *11-*13 (S.D.N.Y. Apr. 4, 2007) (collecting cases).

This split is of no moment in the instant case, however, as each of these decisions addresses the issue of when an EFT becomes attachable as an asset of the beneficiary. Here, GML is the originator of the attached EFTs. There is no debate among the cases on this point: EFTs captured at the intermediary bank are attachable as assets of the originator. See, e.g., Gen. Tankers PTE., Ltd. v. Kundan Rice Mills, Ltd., 2007 U.S. Dist. LEXIS 14355 at *9 (S.D.N.Y. Feb. 21, 2007). Once an EFT has reached the beneficiary's bank, however, it is no longer attachable as an asset of the originator. See Aqua Stoli, 460 F.3d at 436; Seamar, 461 F. Supp. 2d at 225.

Defendants maintain that Citibank served as the beneficiaries' bank, rather than as intermediary bank, and therefore the EFTs are not assets of GML. Plaintiff initially maintained that Citibank was the intermediary bank and that the identity of the beneficiaries' banks remained unknown. (See Dec. 30, 2006 Letter from Lyons to the Court). Later, plaintiff contended that the beneficiaries' bank was Citibank Washington, while the intermediary bank was Citibank New York. (See Feb. 20,

17

2007 Letter from Lyons to the Court). Close inspection of plaintiff's own exhibits offers still another possibility that a bank referred to as "Marine NYC" is the intermediary bank, with Citibank Washington as the beneficiary bank. (See Nov. 22, 2006 and Dec. 8, 2006 Emails from Mihalik to Lyons, attached to Lyons Aff., Ex. B). Finally, the evidence before the Court tends to indicate that Citibank acts as a single unified bank, with all EFTs transiting through Citibank FTN in Buffalo regardless of whether they are destined for Citibank New York or Citibank Washington. (See Feb. 13, 2007 Email from Niles to Quasney, attached to Feb. 15, 2007 Saunders letter to the Court).

Whatever the truth of the matter, Dolco has failed to carry its burden of showing that the attached assets belong to GML. See Aqua Stoli, 460 F.3d at 445. Because no property of GML has been attached, the attachment must be vacated.

## **Piercing the Veil of GML**

The Complaint contains the following allegations upon which the liability of GML is asserted:

Upon information and belief, defendant GML, has been used by defendant Moonriver, from time to time, as a vehicle to pay funds owed to plaintiff Dolco.

Upon information and belief, defendant Bromley is a director of both Moonriver and GML.

18

> Upon information and belief, defendant GML has used
> Moonriver to perpetuate a fraud and/or has so dominated
> and disregarded its corporate form that it primarily
> transacted GML's corporate business rather than
> Moonriver's own corporate business.

(Compl. ¶¶ 7-9).

> The Amended Complaint instead alleges the following:

> Upon information and belief, defendant GML, from time to
> time, made payments to plaintiff to satisfy defendant
> Moonriver's debts and obligations under the Agreement and
> Oral Agreement.

> Upon information and belief, defendant Moonriver is the
> alter ego of defendant GML because GML so dominates,
> controls, and disregards Moonriver's corporate form to
> the extent that Moonriver is actually carrying on GML's
> business and operations as if the same were its own, or
> vice versa.

(Am. Compl. ¶¶ 10-11).

In considering a motion to dismiss pursuant to Rule
12(b)(6), the Court construes the complaint liberally, "accepting
all factual allegations in the complaint as true, and drawing all
reasonable inferences in the plaintiff's favor." Chambers v. Time
Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (citing Gregory v.
Daly, 243 F.3d 687, 691 (2d Cir. 2001)).  "The issue is not whether
a plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims." Villager Pond,
Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting
Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  In other words, "the

19

office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.

"Under the doctrine of limited liability, a corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as piercing the corporate veil." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996). "Federal courts sitting in admiralty must apply federal common law when examining corporate identity." Holborn Oil Trading, Ltd. v. Interpetrol Bermuda, Ltd., 774 F. Supp. 840, 844 (S.D.N.Y. 1991) (citations omitted). "Federal common law in the Second Circuit involves a two pronged test for piercing the corporate veil: the party sought to be charged must have used its alter ego 'to perpetrate a fraud or have so dominated and disregarded [its alter ego's] corporate form' that the alter ego was actually carrying on the controlling party's business instead of its own." Id. (quoting Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980)). Thus, there are two distinct theories under

which a maritime plaintiff may pierce the corporate veil: fraud and alter ego. See Kirno Hill, 618 F.2d at 985; Holborn, 774 F. Supp. at 844.

In its opposition papers, Dolco has effectively withdrawn its initial fraud allegation against GML and proposes to drop that charge, (Pl. Memo. in Opp. at 15). Therefore, GML's corporate veil may be pierced only under the alter ego theory of liability.

The parties differ on the elements necessary to state a claim for alter ego liability. The issue of contention is whether the plaintiff must allege, in addition to domination of the servient company, that such domination was used to commit the wrong of which the plaintiff complains. Under New York law, alter ego liability consists of both elements. See, e.g., JSC Foreign Econ. Ass'n Technostroexport v. Int'l Dev. & Trade Servs., Inc., 295 F. Supp. 2d 366, 377-78 (S.D.N.Y. 2003). However, it is the federal common law -- not New York law -- which governs this admiralty case. In the Second Circuit, federal common law requires that plaintiff allege only domination to state a claim for alter ego liability. See ITEL Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd., 909 F.2d 698, 703 (2d Cir. 1990); Dow Chem. Pac. v. Rascator Mar. S.A., 782 F.2d 329, 342 (2d Cir. 1986); Wajilam, 2006 U.S. Dist. LEXIS 77033, at *17; N. Tankers (Cyprus) v. Backstrom, 967 F. Supp. 1391, 1398-1401 (D. Conn. 1997) (discussing at length this issue and reaching the same conclusion).

21

The Second Circuit has identified a number of factors that are relevant in evaluating alter ego claims: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities. See MAG Portfolio Consultant, GMBH v. Merlin Biomed Group, LLC, 268 F.3d 58, 63 (2d Cir. 2001); Holborn, 774 F. Supp. at 844 (applying these factors in the admiralty context); Wajilam, 2006 U.S. Dist. LEXIS 77033, at *25 (same).

When not based on fraud, "veil-piercing claims are generally subject to the pleading requirements imposed by Fed.R.Civ.P.8(a), which requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (citing Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F.Supp. 117, 122 (S.D.N.Y. 1996)). Suits in admiralty are subject as well to Fed.R.Civ.P.Supp. Rule E(2)(a), which provides that:

22

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading.

Fed.R.Civ.P.Supp.Rule E(2)(a).

"This heightened pleading standard is not some pettifogging technicality meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in in rem admiralty proceedings." P.R. Ports Auth. v. Barge KATY-B , 427 F.3d 93, 105 (1st Cir. 2005) (noting that "[o]rdinary notice pleading does not satisfy the stringencies of [the supplemental] rules"). To survive a motion to dismiss, Dolco "need only allege sufficient facts to support an inference that [GML] has so dominated and disregarded [Moonriver's] form" that GML, rather than Moonriver, conducted Moonriver's business. Wajilam, 2006 U.S. Dist. LEXIS 77033, at *20.

Dolco fails to meet this burden because it has not included any factual allegations that GML exercised complete domination over Moonriver. Other than the conclusory allegation of domination, the Complaint and the Amended Complaint both allege that GML paid Moonriver's debts to Dolco "from time to time."

23

(Compl. ¶ 7; Am. Compl. ¶ 10).[2] Under the heightened standard of Fed.R.Civ.P.Supp.Rule E(2)(a), more is required. See SPL Shipping, 2007 U.S. Dist. LEXIS 18562, at *11 (denying motion to dismiss where complaint alleged that dominant company had made multiple payments on behalf of servient company, "there existed such unity of ownership and interest . . . that no separation exist[ed] between" the two, and funds were intermingled); T & O Shipping, Ltd. v. Source Link, Co., Ltd., 2006 U.S. Dist. LEXIS 88153, at *23-*25 (S.D.N.Y. Dec. 5, 2006) (denying motion to dismiss when the complaint alleged that contracts transacted by the servient company inexplicably bore the name of the dominant company and the entities shared the same ownership, employees, and fax number); Wajilam, 2006 U.S. Dist. LEXIS 77033, at *21 (denying motion to dismiss when complaint alleged a regular practice of diverting and commingling funds, supported by an affidavit alleging that funds were *always* diverted to the dominant company); Tide Line, 2006 U.S. Dist. LEXIS 60770, at *7 n.3 (denying motion to dismiss when complaint alleged that servient company was "merely a shell-corporation" which had no assets, employees or office of its own, used the dominant company's letterhead, and for which the dominant company routinely transacted business despite no contractual agreement to do so). Dolco points only to two instances where GML made payments on behalf of Moonriver, but makes no allegation of intermingling of funds, nor

---

[2] Additionally, the Complaint alleges that defendant Bromley is a director of both companies, though this allegation is withdrawn in the Amended Complaint. (Compl. ¶ 8).

24

any other factor relevant to the inquiry. (See Lyons Aff., Ex. A, at 1-3, 6-7). Under Fed.R.Civ.P.Supp.R. E(2)(a), Dolco's solitary allegation insufficiently alerts Defendants to the basis of its alter ego claim.

## The Motion to Amend the Complaint is Granted

No serious opposition is presented to the Dolco motion to amend its complaint. Only the effect of such an amendment is at issue. Dolco has contended that the treatment granted in Tide Line, supra, is appropriate here, arguing that the Amended Complaint provides a sufficient basis for the attachment. Tide Line exemplifies the difficulties presented in navigating the EFT ocean. There, plaintiff's amendments resulted from additional information being received after the complaint and the attachment. See 2006 U.S. Dist. LEXIS 60770, at *9. The Honorable Kimba Wood vacated the attachment but stayed release of the attached funds pending filing of a renewed attachment request. See id. A different conclusion was reached by the Honorable Kenneth Karas in T & O Shipping, 2006 U.S. Dist. LEXIS 88153. When faced with an adequate piercing allegation, Judge Karas ruled that because information supporting the amended complaint's new allegations were available at the time of the original complaint, leaving the attachment in place would "raise serious due process concerns." See 2006 U.S. Dist. LEXIS 88153, at *22.

25

Here, however, we need not resolve this issue. Dolco fails to state a claim against GML under either the Complaint or the Amended Complaint. Moreover, were the veil piercing claim to stand, there exist sufficient alternative reasons for vacating the attachment at issue in this case. In short, even if this Court chose to follow Chief Judge Wood's Tide Line approach, there is no basis for staying the release of the attached assets.

The motion to amend the complaint is, however, granted.

## Conclusion

For the reasons set forth above, the attachment is vacated, the complaint against GML is dismissed and the motion to amend the complaint is granted.

It is so ordered.

New York, NY
April ᘔ6 , 2007

ROBERT W. SWEET
U.S.D.J.